Opinion filed August 29, 2014



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00098-CV

_____

## SIDNEY BOGUE, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF ELIZABETH BOGUE, DECEASED, ET AL., Appellants
## V.
## MICHAEL D. NEWMAN ET AL., Appellees

**On Appeal from the 42nd District Court**
**Callahan County, Texas**
**Trial Court Cause No. 19,618**

### M E M O R A N D U M   O P I N I O N

This appeal involves wrongful death claims made by Sidney Bogue and other family members[1] that arose in connection with a vehicle collision that resulted in the death of Bogue's wife, Elizabeth. Appellants brought suit against

---

[1]Appellants include the following: Sidney Bogue, individually and as representative of the Estate of Elizabeth Bogue, deceased; the Bogues' four adult children—Melanie Leigh Bogue Quinton, Rory Wade Bogue, Sidney Owen Bogue IV, and Robert Bogue; and Elizabeth's parents—Bobby Jack McCowen and Vivian Elizabeth Bush.

Michael D. Newman, the driver of the vehicle involved in the collision; Associated Contractors, Inc., Newman's employer; and Charles William Bishop, Newman's grandfather and 100% owner of Associated Contractors.

The jury entered findings in favor of Charles Bishop and Associated Contractors, but the jury found Newman liable for Elizabeth's death and awarded damages. The trial court entered a final judgment in favor of Appellants against Newman for $121,776 plus interest. Appellants assert five issues on appeal. We affirm.

## I. *Background Facts and Procedural History*

Travis Hounshell, a trooper with the Texas Department of Public Safety, testified that he was notified that there had been a serious accident between I-20 and Cottonwood. When Trooper Hounshell arrived at the scene, he saw a man in the bar ditch next to someone who was injured; he also saw the bed of a pickup in the center of the highway, a crushed red pickup in the southbound lane, and a larger blue pickup in the bar ditch. Trooper Hounshell determined that Elizabeth Bogue was the driver of the red pickup, and that Newman was the driver of the blue pickup. Trooper Hounshell first checked on Newman, who was the injured man in the bar ditch, and then he went to the red pickup, which was completely crushed; there he found Elizabeth dead inside the pickup.

Trooper Hounshell and Trooper Mike Haley completed the investigation and reconstruction of the accident. Troopers Hounshell and Haley examined the wreckage; took measurements and photographs; and used paint to mark the location of the vehicles, as well as skid and gouge marks, on the pavement. They also marked striations in the road, interviewed Newman, and prepared a report. Trooper Hounshell reported that Newman's blood was tested for the presence of alcohol, narcotics, and drugs but that the blood was negative for all three. Trooper Hounshell also checked Newman's driving record and learned that he had a DUI

2

and one citation for a defective stop lamp. There was no information that Newman's license had been suspended. When Trooper Hounshell asked Newman what he had been doing before the accident, Newman said that he did not remember the accident and that he had just come from his grandfather's farm where he had been "fixing [deer] feeders."

From his investigation, Trooper Hounshell determined that Newman drove a blue pickup on FM2228 and that, as he rounded a curve in the road, he drove left of the double yellow centerline and struck a red pickup being driven by Elizabeth. Trooper Hounshell also determined that Newman had been speeding, that he had crossed the double yellow centerline in a no-passing zone, and that he had struck Elizabeth's red pickup "head on" and had driven over it. Elizabeth died from injuries she sustained in the collision.

Newman worked full-time at Associated Contractors in Abilene. Newman testified that, on the day of the accident, he left work at around 3:00 p.m. and went to his grandfather's farm in Callahan County to fill deer feeders and to fish. Newman had been paid to complete fence work and other tasks at the farm, but he was not paid to fill deer feeders or to fish. While he was at the farm, Newman's wife called him and told him that supper was ready, so he left the farm to go to his home in Abilene.

According to Newman, he had driven on FM2228 many times. He testified that, just before the accident, he looked down and reached to fasten his seatbelt and that, when he did, the accident occurred. When Newman was asked why he had not fastened his belt before driving, he said "probably" because he was in a hurry. Newman testified that he did not remember the accident. He also said that he was traveling the speed limit of seventy miles per hour at the time of the accident, but he admitted that he has oversized tires on the pickup and that oversized tires affect a speedometer reading. Newman admitted that Trooper Hounshell had said that

3

Newman was speeding at the time of the accident. Newman said that he was cited for speeding but that the citation was dismissed.

Newman said that the pickup that he drove on the day of the accident was a pickup that his grandfather, Charles Bishop, had agreed to purchase for him when Newman was seventeen years old. In return, Newman had agreed to pay his grandfather monthly payments, and the pickup was titled in Newman's name. Newman testified that he made the monthly payments and that he paid to add an engine performance chip that would improve fuel economy and towing capacity but also could enhance horsepower performance. Associated Contractors paid for Newman's fuel. Newman said that his grandfather did not have access to the pickup and that Newman and his wife were the only ones that drove the pickup.

Newman said that, the week before the accident, he had left tire marks on the road when he left the farm. His pickup had been in performance mode at that time, but it was not in performance mode at the time of the accident. Newman also admitted that, when he was sixteen years old, he had been stopped for speeding in Nolan County but only received a warning; however, during that same stop, he received a citation for DUI. Newman said that his grandfather had come to pick him up and take him home after he received the DUI citation in Nolan County. The DUI charge was later dismissed.

Newman admitted that, after the Nolan County incident, Newman's grandfather told him to slow down and drive carefully or his grandfather would take the pickup away from him. Newman said that he was not aware that his license had ever been suspended; he also admitted he had received four warnings for speeding after he was licensed and two citations for speeding before he was licensed.

James William Bishop is the vice president of Associated Contractors. James testified that Newman had worked at the Oak Street yard cutting rebar on

4

the day of the accident[2] and that Newman had clocked out and had gone to see his grandfather before he went to the farm to fill deer feeders and to fish. James said that Newman's time sheet for the day of the accident was lost and that James completed one for him so that Newman could be paid the following week.[3] James said that the company had workers' compensation coverage but that Newman did not make a workers' compensation claim in connection with the collision because he was not on the job when the accident occurred. James said that Associated Contractors had an outside group check driving records. He indicated that, if a person did not have convictions, he could drive for the company. James was not aware of a DUI charge against Newman, nor was he aware of any speeding tickets.

Charles Bishop is the sole shareholder of Associated Contractors. Charles has two adult children, Jennifer Smith and James Bishop, and Newman is Charles's grandson. Newman's father was not involved in Newman's life. Charles's father died when he was young, so Charles wanted to be there for Newman. Newman started working for Charles when Newman was fifteen years old. Charles said that Newman came by at 3:00 p.m. on the day of the accident and said he was done with work and was going to the farm to fill deer feeders. Charles indicated that, although Newman may have done work at the farm, he was not paid to fill deer feeders or to fish.

Charles said that he paid for Newman's pickup but that Newman was required to pay him back. The pickup was paid for with a check issued by

---

[2]Elias Salinas testified that he was Newman's supervisor at the Oak Street yard and that he thought he had asked Newman to cut rebar at the farm the day of the accident.

[3]Charlotte Kelley prepared the payroll at Associated Contractors. Kelley said that Newman was paid hourly. Kelley said that code 9027 on a time card reflected carpentry work done at the Oak Street location. Kelley said that time cards were turned in on Friday and that checks were issued the following week. Kelley stated that Defendant's Exhibit 1 was Newman's time sheet that covered the date of the accident; it bore the code 9027, which means he worked at the Oak Street location. Kelley also confirmed that Defendant's Exhibit 3 was the paycheck that covered that period of time.

Associated Contractors, but Charles said that he paid for the pickup and that the pickup was titled in Newman's name because it was Newman's pickup. Neither Charles nor Associated Contractors were listed as owners on the title of the pickup. Charles indicated that the pickup was not a company vehicle and was not depreciated on the company's taxes. Charles said Newman made payments on the pickup. Charles testified that he remembered Newman receiving a warning for speeding and a citation for "minor in possession" in Nolan County when Newman was sixteen years old, but Charles was not aware of any other warnings or citations on Newman's driving record. After the DUI citation, Charles told Newman to drive carefully.

Bobby McCowen, Elizabeth's father, testified that he saw Elizabeth about every two weeks for meals and said that they talked frequently on the phone. McCowen said he has never gotten over Elizabeth's death, but he holds no malice toward Newman.

Sidney Bogue was married to Elizabeth for thirty-six years; he said Elizabeth liked to can foods and research family history and genealogy. They both enjoyed sitting on the porch, walking on their property, and just "doing everything together." Sidney said that Elizabeth worked at Hendrick Medical Center[4] and that his and Elizabeth's health insurance was through Elizabeth's employer. According to Sidney, things have been difficult after Elizabeth's passing because of Sidney's medical conditions and medication.[5] When Sidney went to the scene of the collision and learned that Elizabeth had been killed, it made him "numb." He testified that he feels "lonely" because his whole life revolved around his wife.

---

[4]Evidence was adduced that Elizabeth made approximately $16,000 annually.

[5]Sidney indicated that he was qualified to receive medical care through the Veteran's Administration.

Melanie Bogue testified that she and her mother, Elizabeth, were "very close" and spoke daily. On the day that Elizabeth died, she and Melanie had spoken three times by telephone. Elizabeth was Melanie's "best friend." Melanie was hurt and disappointed that her youngest child, who was born after Elizabeth died, would never get to meet his grandmother.

Sidney Bogue IV testified that he worked for Sallie Mae and that, although he was working in Killeen, he was staying at his parents' house at the time of his mother's death. Bogue IV said that he heard emergency vehicles go by and knew that his mother was not at home, so he was terrified that she might be involved. Bogue IV was there with his father when they learned that Elizabeth had died; Bogue IV said that his relationship with his mother had improved and that everyone felt lost when she died.

Robert Bogue testified that he lived in Cross Plains and that he spent a lot of time with Elizabeth, his mother, cooking in the kitchen. Robert helped Elizabeth can vegetables and make jelly and jam. Robert lived seven miles from Elizabeth and said that his father has had trouble eating and sleeping since Elizabeth's death. Robert also said it is "gut-wrenching" to know that his son will never get to meet his grandmother.

Rory Bogue testified that he lived in Cross Plains and that he called Elizabeth, his mother, about every other day to say that he loved her. Rory tried to visit as often as he could; he said that he enjoyed being in the kitchen with Elizabeth and that after she died, he had trouble sleeping.

The trial court initially granted summary judgment in favor of Charles and Associated Contractors on the claims of negligent entrustment, negligent hiring, joint enterprise, and gross negligence. However, the trial court later reversed its earlier rulings and reinstated the claims of negligent entrustment and negligent hiring. Finally, on the day of trial, the trial court implicitly reinstated the gross

negligence claim against Charles and Associated Contractors. This case was ultimately tried to a jury on negligence, negligence per se, gross negligence, negligent entrustment, respondeat superior, negligent hiring and retention, partnership, and principal-agent theories of liability.

## II. *Issues Presented*

Appellants assert five issues on appeal. Appellants argue in their first two issues that the jury's "no" findings on negligent entrustment and course and scope of employment were against the great weight and preponderance of the evidence. Appellants' third issue challenges the summary judgment in favor of Charles Bishop on the joint enterprise claims. In the fourth issue, Appellants contend that the court erred in excluding the income tax returns of Associated Contractors. Finally, Appellants argue that the jury award of $114,000 to Elizabeth's surviving husband, mother, and four children was against the great weight and preponderance of the evidence.

## III. *Standard of Review*

Appellants have advanced a factual sufficiency challenge to the jury's findings on negligent entrustment, course and scope of employment, and the jury's award of damages. We must consider and weigh all of the evidence and determine whether the evidence in support of a finding is so weak as to be clearly wrong and unjust or whether the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). Under a factual sufficiency challenge, we review a jury's award of damages to determine if the jury's determination is so against the great weight and preponderance of the evidence as to be manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761–62 (Tex. 2003).

Appellants challenge Charles's and Associated Contractors's no-evidence and traditional summary judgment motions. We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). The movant for traditional summary judgment must show there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). A defendant who moves for traditional summary judgment must either negate at least one essential element of the nonmovant's cause of action or prove all essential elements of an affirmative defense. *See Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995).

When summary judgment is granted on traditional grounds, we take the evidence adduced in favor of the nonmovant as "true" and draw every reasonable inference and resolve all doubts in the nonmovant's favor. *Id.* (citing *El Chico Corp. v. Poole*, 732 S.W.2d 306, 315 (Tex. 1987)). With a no-evidence motion, we review the evidence in the light most favorable to the nonmovant, disregarding all contrary evidence and inferences. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex. 2003) (citing *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). A no-evidence summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *King Ranch, Inc.*, 118 S.W.3d at 750–51.

IV. *Discussion and Analysis*

A. *Factual Sufficiency Challenge on Negligent Entrustment, Course and Scope of Employment, and Jury's Damage Awards*

Appellants have advanced, in their first, second, and fifth issues, factual sufficiency challenges to the jury's findings on negligent entrustment and course and scope of employment as well as the jury's damage awards. For a factual

sufficiency review, we examine all the evidence in the record, both for and against the jury's findings. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We must consider and weigh all such evidence in a neutral light. *Golden Eagle Archery,* 116 S.W.3d at 761. But "[j]urors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another." *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). If the evidence at trial would enable reasonable minds to differ in their conclusions, we do not substitute our judgment, so long as the evidence falls within a zone of reasonable disagreement. *Id.* at 822.

### 1. Negligent Entrustment

Negligent entrustment requires proof by a preponderance of the credible evidence of the following: (1) entrustment of a vehicle by the owner; (2) to an unlicensed, incompetent, or reckless driver; (3) that the owner knew or should have known to be unlicensed; (4) the driver was negligent on the occasion in question; and (5) the driver's negligence proximately caused the accident. *Schneider v. Esperanza Transmission Co.*, 744 S.W.2d 595, 596 (Tex. 1987); *Williams v. Steves Indus., Inc.*, 699 S.W.2d 570, 571 (Tex. 1985). A plaintiff proves proximate cause when he or she adduces evidence that the defendant entrustor was reasonably able to anticipate that an injury would result as a natural and probable consequence of the entrustment. *Schneider*, 744 S.W.2d at 596. The evidence at trial was that Newman was the record title holder of the pickup he was driving, that it belonged to him, and that Charles never had access to or control of the pickup. In addition, Charles testified that the pickup was not a company vehicle. There was evidence that Associated Contractors had purchased the pickup and paid for Newman's fuel for the pickup. But, because there is no evidence that the pickup was owned by someone other than Newman, the jury's decision that the other defendants did not

10

negligently entrust the pickup to Newman was not against the great weight and preponderance of the evidence.

### 2. Course and Scope of Employment

The common law doctrine of negligence consists of three elements: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from the breach. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990) (citing *El Chico Corp.*, 732 S.W.2d at 311, and *Rosas v. Buddies Food Store*, 518 S.W.2d 534, 536 (Tex. 1975)). "Under Texas law, in the absence of a relationship between the parties giving rise to the right of control, one person is under no legal duty to control the conduct of another, even if there exists the practical ability to do so." *Graff v. Beard*, 858 S.W.2d 918, 920 (Tex. 1993), *quoted in Loram Maint. of Way, Inc. v. Ianni*, 210 S.W.3d 593, 596 (Tex. 2006).

An employer is liable for the tort of its employee only when the tortious act falls within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007); *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002). The specific elements require that an employee's act (1) must be committed within the scope of the general authority of the employee, (2) in furtherance of the employer's business, and (3) for the accomplishment of the object or purpose for which the employee was hired. *Leadon v. Kimbrough Bros. Lumber Co.*, 484 S.W.2d 567, 569 (Tex. 1972); *Robertson Tank Lines, Inc. v. Van Cleave*, 468 S.W.2d 354, 357 (Tex. 1971); *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 715 (Tex. App.—Fort Worth 2006, no pet.).

Employers generally are not liable for accidents involving their employees while they are traveling to and from work. *See Tex. Gen. Indem. Co. v. Bottom*,

11

365 S.W.2d 350, 354 (Tex. 1963). Plaintiffs who rely on the doctrine of respondeat superior to hold an employer liable have the burden of proving at trial that the employee was acting within the course and scope of his employment at the time of the accident. *Elmore v. E. Sullivan Adver. & Design, Inc.*, No. 11-07-00118-CV, 2008 WL 4349919 (Tex. App.—Eastland Sept. 25, 2008, pet. denied); *Dunlap-Tarrant v. Ass'n Cas. Ins. Co.*, 213 S.W.3d 452 (Tex. App.—Eastland 2006, no pet.); *Soto v. Seven Seventeen HBE Corp.*, 52 S.W.3d 201, 204 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *Mata v. Andrews Transp., Inc.*, 900 S.W.2d 363, 366 (Tex. App.—Houston [14th Dist.] 1995, no writ).

Newman was the record title holder of the pickup. He and his wife had control over the pickup and were the ones that used it. Conflicting evidence was adduced that Newman may have been paid by his employer, Associated Contractors, for work at the farm in the past but that he was not paid for filling deer feeders or for fishing at the farm on the day of the accident. No evidence was adduced that, when Newman was driving home from the farm, he was on a mission that furthered his employer's interests or business; he was simply driving home. After reviewing the record, we cannot conclude that the jury's finding that Newman was not acting in the course and scope of his employment at the time of the accident was against the great weight and preponderance of the evidence.

### 3. Jury's Award of Damages

Appellants claim that the jury's damage awards for pecuniary loss, mental anguish, and loss of companionship and society were against the great weight and preponderance of the evidence. Damages for past pecuniary loss, loss of companionship, and mental anguish were awarded to Sidney. Damages for past loss of companionship and mental anguish were awarded to Elizabeth's parents and children.

The factfinder may award damages anywhere within the range of evidence presented at trial. *Clary Corp. v. Smith*, 949 S.W.2d 452, 467 (Tex. App.—Fort Worth 1997, pet. denied). Pecuniary loss was defined in the jury charge as the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance, that Sidney would, in reasonable probability, have received from Elizabeth if she had lived. Mental anguish is defined as the emotional pain, torment, and suffering that the named plaintiff would, in reasonable probability, experience from the death of the family member. *Moore v. Lillebo*, 722 S.W.2d 683, 688 (Tex. 1986).

Companionship and society mean the positive benefits flowing from the love, comfort, companionship, and society the named plaintiff would, in reasonable probability, experience if the decedent had lived. *Id.* For these two elements of damages, the trier of fact shall be instructed that it may consider (1) the relationship between husband and wife, or a parent and child; (2) the living arrangements of the parties; (3) any absence of the deceased from the beneficiary for extended periods; (4) the harmony of family relations; and (5) common interests and activities. *Id.*

McCowen recounted that he saw Elizabeth about every two weeks for meals and that they talked frequently on the phone. McCowen said that he has never gotten over Elizabeth's death, but he holds no malice toward Newman. Sidney Bogue testified that he was married to Elizabeth for thirty-six years and that, after her death, he lost his health insurance and felt "numb" and "lonely" because his whole life revolved around his wife. Melanie said that her mother was her "best friend," that she had visited the week before her mother's death, and that she was disappointed her son would not know his grandmother.

Bogue IV said that he was there with his father when they learned that Elizabeth had died; he said that his relationship with his mother had improved and

13

that everyone felt lost when she passed. Robert Bogue testified that he spent a lot of time with his mother cooking in the kitchen and that it is "gut-wrenching" to know that his son will never get to meet his grandmother. Rory Bogue testified that he called his mother about every other day to say that he loved her; that he tried to visit as often as he could; that he enjoyed being in the kitchen with his mother; and that, after she died, he had trouble sleeping.

Appellants' testimony about their relationships with Elizabeth was focused on the past and the present, and only Melanie and Robert mentioned the pain they would suffer in the future because their children would not get to meet Elizabeth. Because reasonable minds could differ in their conclusions about the evidence and because the jury's decision falls within the zone of reasonable disagreement, we cannot say that the jury's award of damages was against the great weight and preponderance of the evidence. *See City of Keller*, 168 S.W.3d at 822. We overrule Appellants' first, second, and fifth issues.

### B. Challenge to Charles's and Associated Contractors's Summary Judgment Motion

Appellants challenge, in their third issue, Charles's and Associated Contractors's summary judgment motions on the theory of joint enterprise between Newman and Associated Contractors or Charles. The only claim that was not reinstated from the summary judgment order was that of joint enterprise. There are four elements that are essential to a joint enterprise:

(1) an agreement, express or implied, among the members of the group;

(2) a common purpose to be carried out by the group;

(3) a community of pecuniary interest in that purpose, among the members; and

14

> (4)     an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

*St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 526 (Tex. 2002); *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 613 (Tex. 2000); *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 718 (Tex. 1995).  There is a distinction between right of control and capacity to control.  *Shoemaker v. Estate of Whistler*, 513 S.W.2d 10, 14–15 (Tex. 1974).  Appellants presented no evidence that Associated Contractors or Charles had an agreement or a common purpose with Newman when he drove home from the farm or that any of them had a community of shared pecuniary interest in Newman's drive home from the farm; there also was no evidence of an equal right to direct or control Newman at the time of the accident when he was driving home from the farm.

The evidence showed that Newman was an hourly worker at Associated Contractors who chose to drive home for supper after he had finished filling deer feeders and fishing on his own time.  No evidence was adduced that Charles or Associated Contractors directed or controlled this activity; Newman was not paid for completing this activity; and neither Charles nor Associated Contractors decided when Newman went to the farm or when he left.  In addition, Jimmie Connally (Charles's sister), Charles Bishop, and Britt Bishop (Charles's brother) own the farm, but neither Jimmie nor Britt contribute to its operations or receive any profits from it.  Furthermore, Newman had no interest in or control over the farm.  We hold that the trial court properly granted summary judgment in favor of Charles and Associated Contractors on Appellants' joint enterprise claim. We overrule Appellants' third issue.

*C. Challenge to Evidentiary Rulings*

Appellants assert in their fourth issue that the trial court erred when it excluded from evidence the tax returns for Associated Contractors for the years 2008, 2009, and 2010. Appellants also sought to introduce evidence that a Denali vehicle was listed for maximum depreciation on the schedules and that the vehicle was used by Charles and his wife, although Charles's wife was neither an employee nor a shareholder of Associated Contractors. Appellants contended that, because of the items already on the depreciation schedule, Associated Contractors could not have added the vehicle being driven by Newman. The trial court sustained Appellees' objections based on relevance.

No offer of proof or bill of exception was made by Appellants. Because Appellants failed to make an offer of proof upon the trial court's exclusion of their proffered exhibits and testimony, no error was preserved for appellate review. TEX. R. APP. P. 33; *Way v. House*, 315 S.W.3d 216, 218 (Tex. App.—Eastland 2010, pet. denied) (citing *In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003) (to preserve issue for appellate review, including constitutional error, party must present to trial court a timely request, motion, or objection; state the specific grounds therefor; and obtain a ruling)); *see also In re J.(B.B.)M.*, 955 S.W.2d 405, 410 (Tex. App.—San Antonio 1997, no pet.) (party failed to preserve error by failing to object to the premature conclusion of the trial or by making an offer of proof); *Posner v. Dallas Cnty. Child Welfare Unit of Tex. Dep't of Human Servs.*, 784 S.W.2d 585, 588 (Tex. App.—Eastland 1990, writ denied). We overrule Appellants' fourth issue.

## V. *This Court's Ruling*

Elizabeth's death was tragic and nothing can assuage the grief suffered by her husband, family, and friends. The jury found that Michael D. Newman was

responsible for her death and awarded damages. Because we overrule all of Appellants' issues on appeal, we affirm the judgment of the trial court.


MIKE WILLSON

JUSTICE

August 29, 2014

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.